J-S35020-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RIMEAR CUSTIS | |
| Appellant | No. 587 EDA 2019 |

Appeal from the Judgment of Sentence entered October 3, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0001602-2017

BEFORE: BOWES, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 07, 2020**

Appellant, Rimear Custis, appeals from the judgment of sentence imposed in the Court of Common Pleas of Philadelphia County on October 3, 2018, following his convictions of third-degree murder and endangering the welfare of a child (EWOC).[1]  Both convictions stem from the death of two-year-old Zy'Air Worrell (Zy'Air), the son of Appellant's on-again, off-again girlfriend, Andrea Worrell (Andrea).  Appellant contends the trial court abused its discretion in admitting three photographs of Zy'Air's lacerated liver, in denying a motion for mistrial, and in imposing an excessive sentence for

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(c) and 4304(a)(1), respectively.

Appellant's EWOC conviction. Finding no abuse of discretion in the trial court's rulings, we affirm.

Based on our review of the trial transcript, we provide the following summary of the testimony presented at Appellant's April 2018 jury trial.[2]

At approximately 9:50 p.m. on the evening of November 29, 2016, Andrea left Zy'Air in the care of Appellant so she could help her friend, Starr Williams, find a place for Williams and her children to spend the night. Zy'Air was playing and eating when Andrea left. While Andrea was gone, Appellant called Andrea multiple times and sent text and Facebook messages, asking where she was, what was taking so long, and when would she be home.

When Andrea returned home at approximately 11:30 p.m., Zy'Air was in his bed but Andrea noticed his breathing was abnormal. She tried to awaken the child but was unable to do so. She asked Appellant what happened. He responded that he did not know.

Andrea called 9-1-1 and the police arrived before an ambulance. They transported Zy'Air to the hospital where he died hours later. An autopsy revealed contusions on the child's chest and an abrasion over his right eye.

---

[2] In his Rule 1925(b) statement, Appellant raised a weight of the evidence claim that he has abandoned on appeal. However, in addressing the claim in its Rule 1925(a) opinion, the trial court provided an extensive review of the evidence, complete with citations to the record. Rule 1925(a) Opinion, 5/22/19, at 4-7. We hereby adopt that summary as our own and incorporate it herein as if fully set forth. In the event of further proceedings, the parties shall attach a copy of the trial court's opinion to their filings.

In addition, he suffered from a hemorrhage in his scalp, rib fractures, and multiple lacerations to his liver. Notes of Testimony (N.T.), Trial, 4/18/18, at 138-39. The medical examiner determined that the cause of death was blunt impact trauma to the torso. *Id.* at 162.

After being notified of Zy'Air's death, the police returned to Andrea's home where they found Appellant putting on clothes and gathering his belongings. When they asked his name, he identified himself as Aaron Moses. Appellant was subsequently arrested and charged with Zy'Air's murder.

Both Andrea and Appellant were taken to the Special Victim's Unit before being transferred to the Homicide Unit. When questioned in the Special Victim's Unit, Andrea initially lied, identifying Appellant as Aaron Moses, and saying she had known him for only two weeks. After learning of Zy'Air's injuries, she truthfully identified Appellant and acknowledged their history, which included an incident in July of 2016 when she threatened to end the relationship and he punched her in the lip and punched Zy'Air in the head and in the back. Andrea had called the police to report that incident but did not remain at the scene until police arrived. However, she did post photographs of the injuries on Facebook along with a warning about Appellant. She and Appellant later reconciled after he promised never to strike her or Zy'Air again.

As noted, Andrea initially lied to police—including saying she was with Zy'Air all day on November 29, 2016, but she subsequently changed her statement, explaining she left Zy'Air in Appellant's care and returned to find

him struggling to breathe. She was then charged with EWOC, hindering prosecution, and obstruction of justice. At trial, she testified consistently with the changed statement, and acknowledged her agreement to plead guilty and testify truthfully at trial in exchange for the prosecutor's agreement not to recommend a sentence in excess of the standard range.

The prosecution presented witnesses who corroborated Andrea's testimony. After the prosecution rested, Appellant testified on his own behalf. He claimed that he and Andrea began to argue after she returned from helping her friend find a place to stay, and that Andrea began beating Zy'Air, causing his injuries.

The jury found Appellant guilty of third-degree murder and EWOC but acquitted him on a first-degree murder charge. Sentencing was delayed pending preparation of post-sentence investigation report. On October 3, 2018, the trial court sentenced Appellant to 20 to 40 years for third-degree murder and imposed a consecutive sentence of two and a half to five years for EWOC. Following denial of post-sentence motions, Appellant filed this timely appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents three issues for our consideration:

1. Did the trial court err in admitting the photos of [Zy'Air's] removed [liver]?

2. Did the trial court err in failing to grant a mistrial when Detective Crystal Williams referenced and alluded to Appellant's criminal history?

> 3. Did the trial court give Appellant an excessive sentence by giving him a consecutive sentence on the count of [EWOC] which was outside the aggragated [*sic*] guidelines?

Appellant's Brief at 3.

In his first issue, Appellant argues the trial court erred in admitting photos of Zy'Air's removed liver. Although he asserts trial court error, Appellant correctly acknowledges that the decision to admit photographs of a murder victim is within the sound discretion of the trial court and that this Court will reverse only if the trial court abused its discretion. Appellant's Brief at 1 (citing **Commonwealth v. Funk**, 29 A.3d 28, 33 (Pa. Super. 2011) (additional citation omitted)).

At issue are three photographs of Zy'Air's removed liver, each showing a different plane of his liver where lacerations were noted upon autopsy. Appellant's counsel argued that the photographs were gruesome and should not be shown to the jury. The trial court disagreed, stating:

> Well, this is the key to the entire case. The cause of death was the laceration of the liver. So I'm certainly not going to tie the hands behind the medical examiner here by having him try to explain this without showing what he's talking about. So I'm going to allow these photos to come in. This is not gruesome. Just so the record is clear, it's just an isolated picture of the liver. And so I don't see how anyone would consider that to be gruesome, in the sense that you look at that, it would cloud the jury's assessment of the guilt or innocence. You know, photos that are ordinarily deemed to be gruesome are the ones that show the body of the decedent in some horrific fashion, and this would not be included. It clearly has relevance, so I'm going to let [the prosecutor] show all three.

N.T., Trial, 4/18/18, at 128.

- 5 -

In its Rule 1925(a) opinion, the trial court looked to our Supreme Court's decision in **Commonwealth v. Johnson**, 42 A.3d 1017 (Pa. 2012), where the Court explained:

> When considering the admissibility of photographs of a homicide victim, which by their very nature can be unpleasant, disturbing, and even brutal, the trial court must engage in a two-step analysis:
>
> > First a [trial] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors.

Rule 1925(a) Opinion, 5/22/19, at 13 (quoting **Johnson**, 42 A.3d at 1033-34, in turn quoting **Commonwealth v. Pruitt**, 951 A.2d 307, 327 (Pa. 2008) (additional citations omitted)).

As reflected in the excerpt from the trial transcript, the court properly conducted the two-step analysis, first finding the photographs were not gruesome and then determining they were relevant to assist the jury's understanding of the injuries inflicted upon Zy'Air. Finding no abuse of discretion in that analysis and the admission of the photographs into evidence, we dismiss Appellant's first claim for lack of merit.

In his second issue, Appellant asserts the trial court abused its discretion by denying Appellant's motion for a mistrial relating to testimony of Detective Crystal Williams. As with Appellant's first issue, we review the trial court's

ruling for an abuse of discretion. ***Commonwealth v. Manley***, 985 A.2d 256, 267 (Pa. Super. 2009). "A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." ***Id.*** at 268 (citation omitted).

Detective Williams explained that she was assigned to the Homicide Unit and was charged with investigating Zy'Air's death. When Detective Williams first encountered Appellant at the Homicide Unit, she believed his name was Aaron Moses. N.T., Trial, 4/18/18, at 81. During direct examination, the prosecutor asked Detective Williams how she determined Appellant's actual name. She responded:

> Well, I first, I received information about his name, and then we got him fingerprinted and photographed and we determined that . . . his actual name [was] Rimear Custis.

***Id.*** at 82.

Defense counsel objected. The trial judge sustained the objection and instructed the jury "to disregard the last answer." ***Id.*** Defense counsel advised he would "have a motion at a later time." ***Id.***

The court conducted a charging conference at the conclusion of Detective Williams' testimony. During the conference, defense counsel requested "a mistrial based on the comment that Detective Williams made, wherein she was trying to ascertain a correct name for [Appellant]." ***Id.*** at

114. The court acknowledged that the detective testified she "found out the identity, the correct name of [Appellant] through his fingerprints." *Id.* at 114-15. The court then asked the prosecutor if she was aware her question was going to elicit that answer. The prosecutor replied:

> No. I expected that she was going to say that she learned the name from having reviewed [Andrea's] statement. I did know that he was fingerprinted and photographed. I, certainly, don't think that that response rises to the level of a mistrial being granted.

*Id.* at 115.

> The trial court responded:
>
> Well, listen, you know, you need to be careful, because there's cases out there that say that if it gets before the jury that the defendant had a criminal record, that that can be grounds for a mistrial. Now, I don't believe it is in this instance because it was a momentary reference. I don't believe you acted in bad faith. I accept what you said. It, certainly, would have been better to have prepped the detective. . . .
>
> A mistrial must be granted, it's an extreme remedy—I'm reading from the Superior Court's decision here[3]—that must be granted only when an incident is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial.

*Id.* at 115-16.

The court continued its analysis on the record and denied Appellant's mistrial motion. *Id.* at 117. In its Rule 1925(a) opinion, the court explained its obligation to consider the nature of the reference to Appellant's prior criminal behavior and whether the remark was intentionally elicited. Rule

---

[3] *Manley*, 985 A.2d at 266.

1925(a) Opinion, 5/22/19, at 11. "A singular, passing reference to prior criminal activity is usually not sufficient to show that the trial court abused its discretion in denying the defendant's motion for a mistrial." *Id.* (quoting *Commonwealth v. Parker*, 957 A.2d 311, 319 (Pa. Super. 2008)). Further, "[a] mistrial is not necessary where cautionary instructions are adequate to overcome prejudice." *Id.* (quoting *Commonwealth v. Spotz*, 716 A.2d 580, 592-93 (Pa. 1998)).

Here, the trial court immediately instructed the jury to disregard Detective Williams' answer. Further, the court was satisfied the prosecutor did not intentionally elicit the response. In addition, the court offered to deliver a curative instruction. Defense counsel declined. N.T., Trial, 4/18/18, at 117. The court concluded, "[B]ecause the court had already instructed the jury to disregard the offending comment, the momentary reference to [Appellant's] criminal history, which appeared to have been unintentionally elicited, could not conceivably have prejudiced [Appellant] to the point that it deprived him of a fair trial. Accordingly, no relief is due." Rule 1925(a) Opinion, 5/22/19, at 12 (some capitalization omitted). In an accompanying footnote, the court observed, "Moreover, [Appellant] admitted during his testimony that at the time of the murder, he was on probation and 'on the run for simple possession' and that is why he provided an alias to detectives." *Id.* at 12 n.5 (citing N.T., Trial, 4/18/18, at 187-88).

We find no abuse of discretion in the trial court's reasoning or in its denial of Appellant's motion for a mistrial. Appellant's second issue fails for lack of merit.

In his third issue, Appellant argues the trial court abused its discretion in imposing a sentence of two and a half years for EWOC, consecutive to his sentence of 20 to 40 years for third-degree murder. As such, Appellant presents a challenge to the discretionary aspects of sentence.

This Court has explained:

[T]he proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion. . . . [A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. In more expansive terms, our Court recently offered: An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.

**Commonwealth v. Moury**, 992 A.2d 162, 169-70 (Pa. Super. 2010) (quoting

**Commonwealth v. Walls**, 926 A.2d 957, 961 (Pa. 2007)). As this Court

reiterated in **Moury**:

Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right. An appellant challenging the discretionary aspects of his sentence must invoke this Court's

- 10 -

jurisdiction by satisfying a four-part test: . . . (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Id.* at 170 (internal citations and alterations omitted).

Appellant filed a timely notice of appeal, preserved the issue in his post-sentence motion, and included a Rule 2119(f) statement in his brief. Therefore, we consider whether he has presented a substantial question for our view.

Appellant contends the trial court failed to articulate sufficient reasons for an upward deviation from the aggravated range of the guidelines when it imposed the sentence for EWOC.[4] This Court has recognized that a failure to state sufficient reasons for a sentence on the record presents a substantial question. ***See, e.g., Commonwealth v. Simpson***, 829 A.2d 334, 338 (Pa. Super. 2003) (citing ***Commonwealth v. Wellor***, 731 A.2d 152, 155 (Pa. Super. 1999)). Therefore, we shall consider Appellant's claim.

_____

[4] In his Rule 2119(f) statement, Appellant also suggests the imposition of consecutive sentences resulted in a manifestly excessive sentence. Appellant's Brief at 14. While a challenge to a trial court's imposition of consecutive sentences does not ordinarily raise a substantial question, ***see Moury***, 992 A.2d at 171, Appellant does not present any argument with respect to consecutive sentences. ***See*** Appellant's Brief at 14-15. Therefore, we shall limit our discussion to Appellant's contention that the court failed to state sufficient reasons for an upward deviation.

Appellant argues the upward deviation in his EWOC sentence was inappropriate because the conviction was for a sole occurrence and the gravity of the offense was accounted for in the sentence imposed for third-degree murder. Appellant's Brief at 15. "Further, the court below cited 'the nature of the conduct that led to the endangerment' without further explanation of the specifics." *Id.* (citing N.T., Sentencing, 10/3/18, at 35).

The trial court countered that it considered the evidence presented at trial and the information presented at sentencing, including the pre-sentence investigation report, the Commonwealth's sentencing memorandum, mitigating evidence presented on Appellant's behalf, information related to Appellant's prior record score, the statement from Appellant's grandmother and the victim impact statement, the sentencing guidelines, Appellant's rehabilitative needs, the need for protecting the public, and the gravity of the offence in relation to the impact on the victim and the community. Rule 1925(a) Opinion, 5/22/19, at 9 (citing N.T., Sentencing, 10/3/18, at 32-35). The court further explained:

> While it is true that the EWOC sentence was an upward departure from the standard range of the guidelines and that the sentence was to run consecutively to [Appellant's] murder sentence, the aggregate sentence was well-justified for the reasons explained by the court in detail during the sentencing hearing. Specifically, the court noted that here, the victim was two-years-old and particularly vulnerable. In addition, the court recalled that the evidence at trial established that [Appellant] inflicted considerable pain and suffering onto the victim. Finally, the court noted that the sentencing guidelines for EWOC did not contemplate the extensive nature of the endangerment in this case, as [Appellant] severely and repeatedly beat the victim, causing his death, and

the evidence at trial established that this was not the first time that [Appellant] had hit the victim. Accordingly, the court's sentence was neither excessive, nor unreasonable.

*Id.* (citing N.T., Sentencing, 10/3/18, at 34-35) (some capitalization omitted).

We find no abuse of discretion in the trial court's imposition of Appellant's sentence for EWOC and reject Appellant's assertion that the court failed to state sufficient reasons for an upward departure from the guidelines. Appellant is not entitled to relief.

Judgment of sentence affirmed.


*Judgment Entered.*

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: _10/7/2020_

- 13 -

FILED

2019 MAY 22 PM 2:00

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0001602-2017 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| RIMEAR CUSTIS | : | |

OPINION

BRONSON, J.                                                    May 22, 2019

On April 19, 2018, following a jury trial before this Court, defendant Rimear Custis was

convicted of one count each of third-degree murder (18 Pa.C.S. § 2502(c)) and endangering the

welfare of a child ("EWOC") (18 Pa.C.S. § 4304). On October 3, 2018, the Court imposed a

sentence of 20 to 40 years incarceration for third-degree murder and a consecutive sentence of 2

½ to 5 years incarceration for EWOC, for an aggregate sentence of 22 ½ to 45 years

incarceration.[1] Defendant filed post-sentence motions, which the Court denied on January 25,

2019.

Defendant has now appealed from the judgment of sentence entered by the Court on the

grounds that the Court erred when it: 1) denied defendant's post-sentence motion challenging the

weight of the evidence; 2) denied defendant's post-sentence motion challenging the Court's

---

[1] Defendant's sentencing was continued three times due to defense requests. Defendant waived the right to speedy sentencing under Pa.R.Crim.P. 704. On the date of sentencing, defendant pled guilty to simple possession of a controlled substance in an unrelated open case at docket number MC-51-CR-0014234-2016. No penalty was imposed. The Court also sentenced defendant on three violation of probation ("VOP") cases that were brought before the Court. At CP-51-CR-0000488-2014, CP-51-CR-0002714-2014, and CP-51-CR-0013061-2014, the Court imposed an aggregate sentence of 1 to 3 years incarceration that was to be served consecutively to the sentence in the instant case. The instant appeal does not challenge any of the VOP sentences.

D11

excessive sentence; 3) allowed Commonwealth witness Aletheia Worrell to testify about a prior incident where defendant struck the victim; 4) denied defendant's motion for a mistrial after Commonwealth witness Detective Crystal Williams testified that she ascertained defendant's correct name through the use of fingerprints; 5) admitted inflammatory photographs into evidence; and 6) denied defendant's motion for judgment of acquittal to the charge of first-degree murder. Statement of Matters Complained of Pursuant to Rule of Appellate Procedure 1925(b) ("Statement of Matters") at ¶¶ 1-6. For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia police officer Michael Hanuscin, Philadelphia police detectives Mark Webb, Gregory Santamala, John McNamee, Gregory Yatchilla, and Crystal Williams, Philadelphia associate medical examiner Dr. Daniel Brown, and Starr Williams, Andrea Worrell, Aletheia Worrell, and by stipulation, Dr. Raquel Mora. Defendant testified on his own behalf. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

On November 29, 2016, Andrea Worrell was living at 638 East Clementine Street in Philadelphia with her two-year-old son, the victim, Zy'Air Worrell. N.T. 4/17/18 at 87.[2] Worrell's boyfriend, defendant, also periodically stayed at the residence, and was with the pair that day. N.T. 4/17/18 at 88-89. That evening, at approximately 9:50 P.M., Worrell left Zy'Air with defendant at the residence so that she could help her friend, Starr Williams, find a place to stay that night with her children. N.T. 4/17/18 at 94-96. When she left, Zy'Air was playing and eating. N.T. 4/17/18 at 96.

---

[2] As Andrea Worrell and Zy'Air Worrell share the same last name, Zy'air will be referred to by his first name in order to avoid confusion.

2

While Worrell was out, defendant called her multiple times and sent her a number of messages through text and Facebook, pressuring her to hurry home. N.T. 4/17/18 at 99-101. Worrell texted defendant to ask how Zy'Air was doing, and defendant responded with a picture of Zy'Air, showing that he was asleep. N.T. 4/17/18 at 103.

Worrell returned home at approximately 11:30 P.M. N.T. 4/17/18 at 104; 162. When she arrived, Zy'Air was in his bed and appeared to be sleeping; however, Worrell immediately noticed that his breathing was abnormal. N.T. 4/17/18 at 105-06. Worrell tried to wake him up, but was unsuccessful. N.T. 4/17/18 at 107. She thereafter called 9-1-1. N.T. 4/17/18 at 106. During this time, defendant did not assist Worrell, but instead sat on the bed. N.T. 4/17/18 at 110. When Worrell asked defendant what had happened to her child, defendant responded that he did not know. N.T. 4/17/18 at 110.

After Worrell called 9-1-1, police arrived at the residence and transported Zy'Air to Saint Christopher Children's Hospital, where he was ultimately pronounced dead. N.T. 4/17/18 at 58, 111, 113. An autopsy was performed and it was discovered that Zy'Air had contusions on his chest and an abrasion above his right eyelid. N.T. 4/18/18 at 138. In addition, he suffered from a hemorrhage in his scalp, fractures to his left rib, and multiple lacerations to his liver. N.T. 4/18/18 at 137-39. The medical examiner determined that the cause of death was blunt impact trauma of the torso. N.T. 4/18/18 at 162.

After police were notified of Zy'Air's death, they returned to Worrell's home to hold the residence as a crime scene. N.T. 4/17/18 at 62. When they arrived at the scene, they found defendant in the residence, putting on clothes and gathering his belongings. N.T. 4/17/18 at 62. Police asked defendant his name, and he provided them with an alias, Aaron Moses. N.T. 4/17/18 at 62, 64. Defendant was thereafter arrested for Zy'Air's murder. 4/18/18 at 94.

3

## II. DISCUSSION

### A. Weight of the Evidence

Defendant first claims that the Court erred in denying his "post sentence motion challenging the weight of the evidence as a matter of fact and law." Statement of Matters at ¶ 1. This claim is without merit.

It is well-established that a new trial may only be granted by the trial court where the verdict was so contrary to the weight of the evidence as to "'shock one's sense of justice.'" *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004), *appeal denied*, 878 A.2d 864 (Pa. 2005) (quoting *Commonwealth v. Hunter*, 554 A.2d 550, 555) (Pa. Super. 1989)). Moreover, credibility determinations are solely within the province of the fact-finder, and "[a]n appellate court cannot substitute its judgment for that of the finder of fact." *Commonwealth v. Taylor*, 63 A.3d 327, 330 (Pa. Super. 2013) (internal quotations omitted). In considering a claim that the trial court erred in refusing to find that a verdict was against the weight of the evidence, "appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Id.*

In his post-sentence motion, defendant averred that the verdict was against the weight of the evidence "due to numerous inconsistencies in the testimony of the Commonwealth witnesses, thereby causing the jury to speculate and/or guess." Post Sentence Motions at ¶ 1. While defendant does not specify how the testimony of the Commonwealth's witnesses was inconsistent, at trial during closing argument, defense counsel focused on the inconsistencies between Andrea Worrell's testimony and her two police statements, as the defense's theory was that it was Worrell, and not defendant, who beat Zy'Air to death. N.T. 4/19/18 at 15-24; *see also* N.T. 4/18/18 at 182-85.

4

At trial, Worrell testified that at the time of the murder, she had been dating defendant "on and off" for approximately one-and-a half years and that on the day of the murder, he was staying with her and Zy'Air in her boarding room. N.T. 4/17/18 at 89. She explained that at approximately 9:50 P.M. that evening, she left Zy'Air with defendant so that she could help her friend, Starr Williams, find a place to sleep for the night. N.T. 4/17/18 at 95-96. When she left, Zy'Air appeared to be healthy. N.T. 4/17/18 at 96.

Worrell further testified that while she was out with Williams, defendant repeatedly called her and sent her multiple messages through text and Facebook, asking her when she would be home and pressuring her to hurry up. N.T. 4/17/18 at 99, 103. She could sense that defendant was getting upset as the night wore on. N.T. 4/17/18 at 100. At one point, defendant messaged that he would never watch her child again. Id. When Worrell asked how Zy'Air was doing, defendant told her that he was sleeping and sent a picture of the child in bed. N.T. 4/17/18 at 103. When Worrell returned home, Zy'Air was in bed; however, Worrell immediately noticed that his breathing was irregular. N.T. 4/17/18 at 104-06. She therefore ran down the street to get her cousin, Nicky, so that she could check on Zy'Air.[3] N.T. 4/17/18 at 106. When Nicky observed the child, she told Worrell to call 9-1-1, so she did. Id.

Finally, Worrell recalled an incident that occurred a few months prior to the murder, in July 2016, when defendant punched her in the lip after she had attempted to end their relationship. N.T. 4/17/18 at 123. Worrell also testified that during that incident, defendant punched Zy'Air in the head and in the back. N.T. 4/17/18 at 127, 129. She recounted calling 9-1-1 but leaving before police arrived in order to get away from defendant. N.T. 4/17/18 at 125, 131.

---

[3] No last name was provided for Nicky.

It is true that when detectives from SVU interviewed Worrell immediately after Zy'Air died, she made a number of statements that were inconsistent with her testimony at trial. First, Worrell provided detectives with the incorrect name for defendant, telling them that his name was Aaron Moses. N.T. 4/17/18 at 185; *see also* Commonwealth Exhibit C-4 (Worrell's first statement at SVU). She also told them that at the time, she had only been in a relationship with defendant for two weeks. N.T. 4/17/18 at 185, 204; *see also* Commonwealth Exhibit C-4, C-5 (Worrell's second statement at SVU). In addition, she reported that on the day of the murder, she was with Zy'Air all day, only leaving him for a short amount of time that afternoon to go to the store. N.T. 4/17/18 at 195, 200-01; *see also* Commonwealth Exhibit C-4. Finally, she denied that defendant had ever previously hit Zy'Air. N.T. 4/17/18 at 205; *see also* Commonwealth Exhibit C-5.

At trial, Worrell credibly explained that she was not truthful to SVU detectives because she was scared, and at the time, she was unaware of what had caused her son's death. N.T. 4/17/18 at 116, 120. Once she learned of the extent of her son's injuries, she decided to tell detectives "everything" and provided them with a statement that was consistent with her testimony at trial. N.T. 4/17/18 at 122-23; *see also* Commonwealth Exhibit C-6 (Worrell's statement at Homicide). Worrell also admitted that after she changed her statement, she was charged with endangering the welfare of a child, hindering a prosecution, and obstruction of justice. N.T. 4/17/18 at 134. She explained that she pled guilty to those charges and agreed to testify truthfully at defendant's trial and in exchange, the Commonwealth agreed not to recommend a sentence that exceeded the standard range of the Sentencing Guidelines. N.T. 4/17/18 at 134-39; 143-44.

6

The Commonwealth also presented additional evidence that corroborated Worrell's testimony. First, Starr Williams confirmed that on the night of the murder, Worrell was with her from approximately 10:00 P.M. to 11:40 P.M., helping her look for a place to sleep that night. N.T. 4/17/18 at 75, 77. Moreover, text messages confirmed that between approximately 9:45 P.M. and 10:00 P.M. that evening, Worrell and Williams were trying to locate one another, and that Worrell later texted Williams at 11:27 P.M., telling her that she was halfway home. N.T. 4/17/18 at 82-84; *see also* Commonwealth Exhibit C-20 (Andrea Worrell's phone records). The Commonwealth also presented phone records revealing that defendant called Worrell multiple times and sent her numerous text and Facebook messages while she was out with Williams, telling her to hurry up and promising that he would never again watch her child. *See* N.T. 4/17/18 at 165-72; Commonwealth Exhibit C-20. Finally, the Commonwealth presented evidence that corroborated Worrell's account of the prior domestic incident that occurred in July 2016. First, Worrell's mother, Aletheia Worrell, testified that her daughter had previously told her that defendant had hit Zy'Air. N.T. 4/17/18 at 231. In addition, Detective Santamala testified that after Worrell told Homicide detectives about the incident, the detectives were able to locate the record of the 9-1-1 call that Worrell had placed, which reported that a 6'1 black male assaulted a female and a one-year-old child. N.T. 4/18/18 at 33-34. Finally, defendant, during his interview with Homicide detectives, admitted to hitting Zy'Air on one occasion during the summer of 2016 because Zy'Air was being bad. N.T. 4/18/18 at 198-99; Commonwealth Exhibit C-28 (defendant's statement at Homicide).

Accordingly, the evidence fully supported the jury's verdict, and therefore, the Court did not abuse its discretion in denying defendant's motion for a new trial.

*B.   Abuse of Discretion at Sentencing*

Defendant next claims that the Court "erred in denying [defendant's] post sentence motion challenging the excessive sentence imposed by the court." Statement of Matters at ¶ 2. This claim is without merit.

"Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of that discretion." *Commonwealth v. Anderson*, 552 A.2d 1064, 1072 (Pa. Super. 1988), *appeal denied*, 571 A.2d 379 (Pa. 1989); *see Commonwealth v. Walls*, 926 A.2d 957, 961 (Pa. 2007). The sentencing court must consider the need to protect the public, the gravity of the offense in relation to the impact upon the victim, the rehabilitative needs of the defendant, and the sentencing guidelines. 42 Pa.C.S. § 9721(b); *see Commonwealth v. Hyland*, 875 A.2d 1175, 1184 (Pa. Super. 2005).

As to consecutive sentences, "[l]ong standing precedent of [the Superior] Court recognizes that [the Sentencing Code] affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed." *Commonwealth v. Marts*, 889 A.2d 608, 612 (Pa. Super. 2005). Accordingly, the decision to sentence consecutively fails to raise a substantial question on appeal unless that decision "raises the aggregate sentence to, what appears upon its face to be, an excessive level in light of the criminal conduct at issue in the case." *Commonwealth v. Mastromarino*, 2 A.3d 581, 587 (Pa. Super. 2010). Therefore, an appellate court will not disturb consecutive sentences unless the aggregate sentence is "grossly disparate" to the defendant's conduct, or "viscerally appear[s] as patently 'unreasonable.'" *Commonwealth v. Gonzalez-Dejusus*, 994 A.2d 595, 599 (Pa. Super. 2010).

8

Here, in fashioning an appropriate sentence, the Court explicitly considered the following: everything that was presented throughout the history of the case and at trial; the information that was presented at sentencing, including defendant's pre-sentence report, the Commonwealth's sentencing memorandum, the mitigating evidence that was submitted on behalf of defendant, the information obtained from the investigation into defendant's prior record score, the statement of defendant's grandmother in support of defendant, and the victim impact statement from the victim's mother; the sentencing guidelines; defendant's rehabilitative needs; the need for the protection of the public; and the gravity of the offense in relation to the impact on the victim and on the community. N.T. 10/3/18 at 32-35

While it is true that the EWOC sentence was an upward departure from the standard range of the guidelines and that the sentence was to run consecutively to defendant's murder sentence, the aggregate sentence was well-justified for the reasons explained by the Court in detail during the sentencing hearing.[4] Specifically, the Court noted that here, the victim was two-years-old and particularly vulnerable. N.T. 10/3/18 at 34. In addition, the Court recalled that the evidence at trial established that defendant inflicted considerable pain and suffering onto the victim. N.T. 10/3/18 at 34. Finally, the Court noted that the sentencing guidelines for EWOC did not contemplate the extensive nature of the endangerment in this case, as defendant severely and repeatedly beat the victim, causing his death, and the evidence at trial established that this was not the first time that defendant had hit the victim. N.T. 10/3/18 at 34-35. Accordingly, the Court's sentence was neither excessive, nor unreasonable.

---

[4] Applying the Seventh Edition of the Sentencing Guidelines, the parties agreed that defendant had a prior record score of five. N.T. 10/3/18 at 15. The parties also agreed that using the Basic Sentencing Matrix, third-degree murder had an offense gravity score of fourteen, with a guideline range of 192 to the statutory limit, minus 12 for the mitigated range; and EWOC had an offense gravity score of five, with a guideline range of 12 to 18, plus or minus 3 for the aggravated and mitigated ranges, respectively. *Id.*

9

Commonwealth v. Rimear Custis
Type of Order: 1925(a) Opinion

CP-51-CR-0001602-2017

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P. 114:

**Defense Counsel/Party:**

> Lee Mandel, Esquire
> 1500 J.F.K. Blvd.
> Suite 405
> Philadelphia, PA 19102

**Type of Service: First Class Mail**

**District Attorney:**

> Lawrence Goode, Esquire
> Interim Supervisor, Appeals Unit
> Office of the District Attorney
> Three South Penn Square
> Philadelphia, PA 19107

**Type of Service: Interoffice**

**Additional Party:**

> Joseph Seletyn, Esquire
> 530 Walnut St., Suite 315
> Philadelphia, PA 19106

**Type of Service: First Class Mail**

**Dated: May 22, 2019**

Kaitlin D. Shire
Law Clerk to Hon. Glenn B. Bronson